WESTERN AND ATLANTIC RAILROAD CO. *v.* MORAN.

Although it appeared that the defendant company failed in its duty to furnish to its employees reasonably safe machinery, yet as the plaintiff's deceased husband, who was a servant of the company, knew of the defect in the machinery which she alleged was the proximate cause of his death, but nevertheless voluntarily assumed the risk of being injured thereby, a verdict in her favor was wholly unwarranted.

Argued October 9, — Decided October 30, 1902.

Action for damages. Before Judge Fite. Whitfield superior court. January 30, 1902.

*Payne & Tye* and *R. J. & J. McCamy,* for plaintiff in error.
*Jones & Martin,* contra.

SIMMONS, C. J. This case was before this court at the March term, 1901, it then sounding " *Western & Atlantic Railroad Co. v. Jackson.*" See 113 *Ga.* 355. The judgment of the court below having been reversed, and the case again coming on for a hearing in that court, counsel for the plaintiff announced that she " had married one John Moran, and he took an order that the case thereafter proceed in the name of Alice Moran." The result of the trial was a verdict in her favor; whereupon the railroad company made a motion for a new trial, which was overruled, and it excepted.

While the motion contains several special grounds, we deem it unnecessary to deal specifically with any of them; for, in view of the evidence upon which the plaintiff relied as sustaining her allegations of negligence on the part of the company and as showing that her deceased husband was free from fault, we are constrained to hold that the verdict in her favor was wholly unwarranted. The following uncontroverted facts were brought to light at the last hearing. On the day Jackson received the injuries from which he afterwards died, the section-gang, of which he was a member, "was directed by John McFarland, the section-boss, to put a lever-car on the track and go down the road." By his orders, the car was stopped at a designated point in order that some scrap iron might be loaded upon it. The first piece put on was a crooked rail, some fifteen feet long, which had been bent "nearly into a half circle." On top of this was placed a straight piece of rail, about twenty feet long. The section-boss said he did not believe these rails could be safely carried that way, but Jackson replied that they could, saying he would get on one end of them, one of his fellow-workmen on the other, and in this way they could be held on the car. To this plan the section-boss assented, and the car was started up the road. After arriving at a certain crossing, the car was, by his directions, unloaded and lifted off the track in order to allow a train to pass. After it came along, the car was again put upon the track and reloaded in the same way with the two pieces of rail. The car was started down grade and attained a speed which made it "wabble." "Jackson was on the rail out in front of the car," and, by reason of the fact that "the car was wabbling and the iron bouncing," he fell or was thrown off the rail. Every possible effort to stop the car was made by his fellow-laborers and the section-boss, but, the brake on the car being defective, it "ran seven rails and a piece of an eighth before it was stopped." Jackson was caught by "the cogwheel on the main axle" of the car, and dragged that distance. "The lever-car was out of order at the time; . . the axle of the front wheels had been sprung, making the car wabble as it ran." Jackson had full knowledge of this defect in the car, which had been occasioned by "a collision with an engine about a month or six weeks before," and had commented on it, saying that the bent axle made the car "harder to pull." A witness introduced by the plaintiff testified that when, after the train had passed, the sec-

tion-hands were preparing to reload the car, he said: " Let's not put on the crooked rail first;" but the boss said, " By God, put it on like it was; I am boss here," and that his order was complied with.   Jackson, however, made no protest, but assisted in reloading the car in the same manner in which he had previously suggested it should be loaded, and voluntarily again assumed the dangerous position he had occupied when the car was first started on its journey.   In going to the point where the stop was made to let the train pass, he had kept his feet on the car, and possibly his hands also; but after the car was reloaded and again started, " he had both hands on the rails and was swinging his feet down."  So far as appears, he was a man of ordinary intelligence and familiar with the dangers incident to the work in which he was engaged. Indeed, McFarland, the section-boss, testified:  " George was a good hand and the brightest negro I had; when I had to leave, I left him in charge of the other hands."

While the duty rests upon a master to provide " machinery equal in kind to that in general use, and reasonably safe for all persons who operate it with ordinary care and diligence" (Civil Code, § 2611), it is equally true that "A servant assumes the ordinary risks of his employment, and is bound to exercise his own skill and diligence to protect himself"; so it follows that although a master may be negligent in furnishing defective machinery, a servant who is injured because of the fact that it is not in a reasonably safe condition is not entitled to recover unless it appears that he " did not know and had not equal means of knowing such fact, and by the exercise of ordinary care could not have known thereof."   Id. § 2612.   In the present case it affirmatively appeared that Jackson had full knowledge concerning the defective condition of the axle of the car; and this being so, he must be held to have voluntarily assumed all risks incident to using the car while in that condition.   It is also apparent that he took the chances of being injured on account of the manner in which the car was loaded; for whatever danger attended the running of the car while thus loaded was certainly an open and obvious peril with knowledge of which he was chargeable.   Nor was the plaintiff entitled to recover on the theory that although Jackson may have been negligent in voluntarily exposing himself to an obvious danger, this was not the proximate cause of his injuries, and he would not have been seri-

ously hurt had not his fellow-servants negligently failed to take prompt and effective measures to stop the car as soon as the fact that he had fallen upon the track and was in a perilous situation became known to them. This theory was, it is true, distinctly presented by the allegations in the plaintiff's petition; but, as has been seen, the testimony showed unequivocally that every possible effort to stop the car was promptly made, and that the sole reason why it was not more quickly stopped was that the brake on the car was defective and did not work properly. On the argument of the case before this court, counsel for the defendant in error laid great stress upon the fact that the evidence disclosed that the car was furnished with a brake which was out of order, and upon the further fact that Jackson was not shown to have been aware of its defective condition. We can not, however, uphold the verdict on the ground that the company was negligent in the respect just indicated, for the reason that the plaintiff nowhere in her petition makes mention of the defective condition of the brake, or predicates her alleged right to recover on the theory which her counsel for the first time urge before us. That a plaintiff must recover, if at all, upon the case made by his pleadings, is an axiom which we are not at liberty to overlook or disregard.

*Judgment reversed. All the Justices concurring, except Lumpkin, P. J., absent.*